Good morning. Gary Grasso on behalf of Mr. Katz's Bankruptcy Trustee for Mr. Brewer. Fifteen minutes, Your Honor. Brief rebuttal. Good morning, Your Honor. Paul Ripp on behalf of Defendant Arend and Henderson and Lyman. I would like fifteen minutes as well. All right. Mr. Grasso, whenever you're ready. I will tell you, please bear in mind, we have all read the briefs, we're familiar with the issues and your arguments. Thank you. I appreciate the time that you're going to give us this morning. My name is Gary Grasso. I'm here for Mr. Katz's Bankruptcy Trustee for Mr. Brewer. And I'm asking on behalf of Mr. Katz and Mr. Brewer that this court reverse the trial court, because the trial court impermissibly determined the question of fact, whether Stephen Brewer possessed the necessary intent for impari delicto to be applied in a legal malpractice case. It is clear from the record here, we believe, that the intent of Mr. Brewer was to follow his attorney's advice. You have two instances where that is proven in the record. One is that he asked his attorney whether or not he needed to register these offerings as securities, and his attorney said, no, you do not. And even at his deposition, the attorney said, I still believe that that is true, and I would tell him the same thing today. So let's assume the attorney may be guilty of negligence, malpractice. How does that change the consideration of impari delicto? Well, because you have to have, Your Honor, you have to have the intent to do an illegal act. You have to have the intent. That's not what the cases say, though. The idea of impari delicto, according to Illinois cases, is to keep courts from serving as a referee between thieves is one way it's been put. Well, sure. And that's – there's nothing wrong there. But when you say thieves, you've already concluded that they had the intent to do the thievery. So if you look at Robbins – No, but that's not what the cases say. The cases don't say you need to look at intent. Impari delicti is where there is a wrong done by Brewer and Big. And there may have been a wrong done by the attorneys, but what Brewer is trying to do here through Katz is to profit, that is to regain some of the money that he has to pay out because of the SEC action. Well, that's allowed. Legal malpractice is allowed to collect your actual damages. I understand, but he has admitted that he took 98 percent of that money, went to sources other than what it should have been, Barclays Bank. Two percent went to Barclays, right? Correct. Okay. He admitted it. So his actions there puts him impari delicti. That's why we don't need to look at intent. Yes, you do. Because why did he do that? He did that on advice of counsel, longstanding counsel, that this – he could do this. And when you look at the PPO – If that's true, if we accept that as true, that Mr. Aaron told him that you can put out this private offering memorandum, you can tell your investors that I'm going to use the proceeds to pay down the Barclays loan that secures the assets. And so that lien will be released and those assets will come back to the corporation. And he tells Mr. Aaron, you know, I'm really not going to do that. I'm going to spend 98 percent of it on bigs operations, and I'm going to take some for myself. That's classic impari delicto. It is not in this context, Your Honor. Because what he did do, Mr. Brewer is saying, in the beginning, prior to the issuance of the June one-year note and the three-year notes, if you look at the documentation itself, that he told Mr. Aaron that he was going to use some of the money, maybe a lot of the money, for big. And Mr. Aaron then wrote the PPOs. And when you look at the chart that's in the record, just regarding the drafts that the trial court didn't want to look at, but if you look at the actual drafts, excuse me, the actual offerings that were put out by big, it was all drafted by Aaron, who says in there, on the use of proceeds, there isn't anything in there about Barclays. It says in the use of proceeds that the money could be used by the note manager, which is big. And so then you add to this. You add to this that the internal compliance officer looked at the offering and raised issues with Mr. Brewer, and Mr. Brewer said, this is what the lawyer, my longstanding lawyer, who's told me that I don't need to register and that this PPO is adequate as a disclosure, but go ahead and talk to Mr. Aaron about this. And he did that. And Mr. Aaron told him, this is sufficient for the offering. These investors, these investors who invested millions of dollars. Well, it wasn't millions of dollars, but okay. Thought they were going to get an investment secured by the capital that would be released, the assets that would be released by Barclays, right? I don't know what they thought. That's what it said. That's what it said, but now you're implying what they understood. They ended up with an unsecured investment, right? Totally unsecured because all the proceeds went elsewhere. It wasn't secured by anything. There was going to be a waterfall of where the money was going to be, but in fact, if you might look in the record, the investors had recovered almost all of their money because there was more than enough assets in the insurance policies themselves that were behind this whole thing. We have to get back to what I believe was the improper. The insurance policies were for what? DNL? There were life insurance policies, yes, I know to this extent. They were life insurance policies, the proceeds of which were pledged to back up the investments and the note that Barclays had and the money that Barclays had lent. The issue, however, is under these circumstances, whether or not you have come to the conclusion, if you were sitting on the jury, that Mr. Brewer had the reckless intent for impari delicto, which requires a knowing intent to do an illegal act or an immoral act. You're sitting as the jurist. That's exactly what the trial judge did. Even in the Butera case, they said, in the Pedersen case, they said it's a question of fact. What you're doing is exactly what the trial judge did and said, well, let's see. He knew, he says he knew generically what's in the PPO. He said he knew. She is the trial judge. No, no. The trial judge, she, said that he, Mr. Brewer, knew what was in the PPO. There's no specific questions in there as to anything about it other than the generic question, did you read the PPO and know the PPO? Yes. And then you spent the money and you had access to the bank accounts. Those three facts, the trial judge, she, said, okay, I'm now going to come to the determination that he had, he, Mr. Brewer, had the reckless intent for impari delicto, and I'm going to find that he knowingly committed an illegal or immoral act. Okay? That's taking it out of province of the jury. Whether or not we have a strong case or a weak case isn't the issue before this Court. The issue is, did the trial judge invade the province of the jury? Clearly. There isn't anything in the record, as there is, for example, in the Robbins case. All that was wrong here was that these securities weren't registered and that Mr. Brewer used the proceeds to pay down Barclays, to release the assets, to secure the investors' investment, that he would have been ordered to disgorge millions of dollars? There were seven counts under which he was brought, okay? But the two principal reasons were failure to register, which Mr. Herron says, that was wrong. And by the way, the underlying proceedings, the release and the consent decree, specifically say this is not an admission, this is only for purposes of this situation, and as we all know, put yourself there, Mr. Brewer had run out of money, couldn't defend himself any longer in front of the SEC. Okay? So he enters into a consent decree, which is not law of the case, which is a total different standard, which does not allow one to assert advice of counsel at all. That's what the civil side is doing, and that's what we're allowed to do in a legal malpractice case. And whether or not the case is weak or strong and whether or not you believe Mr. Brewer, that's exactly the point. It's for a jury to determine his intent. And intent is part of imperative deliberation. His intent as to what? His intent to deceive the public, and his intent to do that. Whether he did or not, he participated in a fraudulent conduct. Do you agree he participated in fraudulent conduct? I do not. You're doing exactly what the trial court did, and the trial court said, I'm looking at the SEC consent decree, which should have no application. We just look at the depositions that was taken at this case and the admissions he made. So let's forget the SEC. He made admissions in this case. He did. And those admissions say he participated in a fraudulent conduct. No. That's your conclusion. No, I don't think that's a conclusion at all. Those are his words. No, he never said that. He said that I spent ‑‑ I did use the money. This was hard times. This is the recession. And when you look at the ‑‑ He used money he wasn't supposed to be using. He didn't say that. He said he was using money. In fact, he said, I understood from Mr. Aaron that I could do this. Mr. Aaron, in his own deposition, says, I told him he could use it for some of his ‑‑ for his expenses of big. I understood that this is what he was doing. For his own personal expenses? For his own personal expenses? That isn't ‑‑ which he reimbursed. Some of the money he used for his own personal expenses? If you looked at the discovery, which he then reimbursed, which is done in my law firm all day long. We have a credit card. Sometimes we use it for personal expense and then we reimburse. That's exactly what the discovery shows. But you're not doing an offering. And that's not part of the concession. But that's not an offering to the public. That's different. When you do it in your law firm, you can do what you want unless you're ‑‑ if you're doing it and you told me you weren't going to do something like that, that would be a violation of the offering. If your law firm made an offering to me that you're going to use it for a certain purpose and you're borrowing it without my knowledge of that, I think that's a violation. And that's what we're talking about. And we may come to that conclusion sitting on the jury. Okay? But you're doing what you're not ‑‑ What case says that in this situation, within ‑‑ in pari delecti, we have to show intent? You know, you have to ‑‑ there has to be a showing of intent. What case are you relaying? What case are you relaying? Robbins v. Lasky, Metties v. Quinn, both of which are premised on the fact that the client came to the lawyer in Metties v. Quinn, she knew she had illegally converted the money in her possession, and she went to the lawyer and said, I know I converted this money. How can I do something so that they won't find out? Okay? In Robbins v. Lasky. It was a case, actually, it was my case. That the Robbins came in and said, we're under a tax deficiency. Our liquor stores are under a tax deficiency. How do I get out of paying the tax deficiency? Both plaintiffs knew they had already committed a wrong, and then they're going to the lawyer to try to make it right. Metties v. Quinn is also ‑‑ there's another one in the second district, Mackler v. Roach, which is in the ‑‑ that's another one where the plaintiff came in and said, I know I have these legitimate bills that have been incurred by my husband staying in a nursing home. How can I get out from paying these legitimate bills? The predicate, Your Honor, is not here. And so those cases are always about intent. Because the intent there is, how do I get out of the fraud I already know I've committed? That is not what's going on in Brewer. It's exactly the opposite. Now, you may not believe him, but he gets to make his case to the jury. Well, what about King v. First Capital Finance Services, where the Illinois Supreme Court has said that the doctrine of in pari delicti embodies the principle that a plaintiff who has participated in a wrongdoing may not recover damages resulting from the wrongdoing. But that's a ‑‑ McGrath v. BDO. The in pari delicti offense exists only because wrongdoers must not be permitted to benefit from their wrongdoing. Right. And the premise of all of those cases, when you go back and read them, is that the client knew that they had committed a wrong. And they were going to the lawyer to try to get away with it, if you will. That is not what happened here. So if there's anything in the record that shows that your client knew he was committing a wrong, then you would lose. Correct? If there's anything in the record that says that he knew that he was committing a fraud, which there is not in this record, that is the premise that you have to have. And then you have to have him going to Aaron and saying, I know I can't do this. How can I do it and get away with it? That's essentially what is required in pari delicto. And even in the Peterson case where ‑‑ You don't have to have a client who goes and tells the lawyer I've committed a wrong. If he just goes to the lawyer, he doesn't say anything, and he says, hey, can you help me out here, that's still in pari delicto. Yes. Again, you're with the premise that the client knows they've done something wrong, and now they're coming to the lawyer to get away with it. No. It can be the client gets away with it after the fact. I mean, he could go to the lawyer, tell the lawyer what he wants, and then try to get away with it afterwards. But that isn't what happened here. That isn't what happened here. Mr. Aaron knew everything that he was going to take 98 percent of the ‑‑ There is evidence in the file that's a question of material fact on that issue that he went and told Aaron Brewer himself, testified at his deposition that I told Mr. Aaron on ‑‑ there's a June 12th, I believe, e‑mail. I can't remember the year. Maybe it's 2011. June 12th e‑mail in which he says to Aaron, we're going to use all of this money or most of it for big. After that is when ‑‑ So they're co‑conspirators. They're not co‑conspirators. Right. They just agree with each other that they were going to do something that was not disclosed to the ‑‑ If you, again, now you're coming to the conclusion, with all due respect, that Mr. Aaron is in on it. Okay? Mr. Aaron has, for example, already said ‑‑ I'm just based upon what you're telling me. No. I'm based on what's in the record. Mr. Aaron, for example, has already said, I told him that he didn't have to register this stuff. I understand that. That's a different issue. And, yes, I understood, if you look in our briefs and even in Apple Lee's brief, that I understood this money was going to be used for big. And, in fact, he gives a tax opinion also in June before any of these things come out. That is, these things. Before any of the PPOs are issued for the one‑year and the three‑year note in June. Mr. Aaron knows all of this. Now, I'm not saying that Mr. Aaron was committing a fraud. I'm not saying Mr. Brewer was committing a fraud. Now, that might be the argument of the defendant, and I don't believe that Mr. Aaron said in his deposition, I knew there was something wrong here. He said, I thought this was okay. And he wrote the use of proceeds. When you look at the use of proceeds. I'm going to read to you from the PPM. It says, the company has granted security over these assigned assets to Barclays Private Client International Limited, being the provider of current loan facilities to FPP. It is intended that the proceeds of this offering will be lent to FPP by the company bid and used by FPP to discharge this indebtedness. And that's a representation that the proceeds of the offering are going to go to pay down the Barclays loan. That may well be. It is. That's what we're going to do with the proceeds. It isn't in the use of proceeds section for the three‑year note and the one‑year note. It says, funds anticipated and to fund anticipated further investments of the company's parent company, FPP. And in the third‑year note, it says, one possible investment is to be made in the note manager. The use of proceeds is nowhere in there, says Barclays. Nowhere in there. We don't read this offering as a whole. We don't read this very clear representation that we're going to use the proceeds of this offering to pay down the Barclays loan. We should parse out something else and say, well, they didn't really mean it. No. That's one line that you've picked out out of the PPO and only one of the PPOs that Mr. Aaron wrote. Okay? Now, you're saying that Mr. Brewer should have understood, therefore, again, you're implying his intent, that he should have therefore understood that he couldn't use the funds for big when it says that elsewhere in the document. And he went to his lawyer and asked him, and his lawyer in the record says, yeah, that was one of the things that could be done. But that goes to my point. In the face of this representation in the offering materials, what you're saying is Mr. Brewer went to Mr. Aaron, told him, we're going to make this representation that we're going to use the proceeds to pay down the Barclays loan. But I'm really not going to do that. I really want to use the 98% of this to fund my corporation and for some of my own expenses. That's classic in peri delicto. No, it is not here. That's true. If that's true and Mr. Aaron knew that and then put out these offers, that's classic. But, again, you are reading into what Mr. Brewer's intent was. And that is exactly what the trial judge did when she rendered her decision. That is not allowed. You have to, maybe, again, the defendant's argument. But Brewer also has in the record that I understood I can do this. You may say it's not credible. Okay? But he has a long history with this lawyer, and he also is in the context of he also told me I didn't have to register this, which he also ends up getting prosecuted for by the SEC. You have to take the whole case in totality, and he gets the benefit of the doubt on the intent issue. You may not think it's a strong plaintiff's case. You may think it's a great defense case. You may have already decided how you're going to rule if you were on that jury. But that isn't the province of the trial court. You have to have the same situation as you had in Robbins, Metis, and Makala. And that is that there's evidence in the record that he knew and understood that he was committing a wrongful act to defraud these investors. If he admitted to that, then you have him. That's what existed in these other cases. And then if you had him admit that in his depositions, and then he said, but I was going to do it anyhow because I was going to rely on Aaron as a defense, then maybe you have him. Now, that isn't in this record. But it doesn't need to be in this. Isn't imputed knowledge part of what imperi delictae is about? Imputed knowledge. That is very similar to imperi delictae. If it's what you do is if it's his imputed intent. If you say, yes, okay, I knew I was doing something wrong, and I went ahead and here's how I tried to hide it, then you've got him. You don't have that in this record. The trial judge, with due respect to her, stood Robbins and Metis and Mackler on its head. She assumed that he knew he was going to commit a deceptive act and then went back to the beginning of June because there's also no indication of exactly when he thought he was going to have to use most of this in this situation. So you have you cannot imply what his intent was, and you're saying I'm going to impute that he's going to. Well, that's part of what imperi delictae means. No. With due respect, Your Honor, I don't. You may disagree. You and I disagree on that. But I think if a close reading of the cases, you would see that it is the foundation of the doctrine is that the client knows he or she has committed an illegal act, a deceptive act, and is trying to use a lawyer, even if the lawyer knows it or not, to get away with it. That isn't the situation here, especially with a long-term relationship with Mr. Arend on this and sending the compliance officer to Mr. Arend to see is this sufficient for what we're doing here. And Arend tells the compliance officer it is. So with due respect to the trial judge, I would ask you to reverse it. All right. Thank you, Mr. Grasso. Thank you. Mr. Ripp. Good morning, Your Honors. Paul Ripp on behalf of the defendant, appellees. May it please the Court. Claims to minimize Brewer's conduct that led to the SEC action. But Brewer is not a novice. He participated in the creation. Let's talk about the issue we just talked about. Okay. It really has to do with, according to the appellant, intent. Does there have to be a show of intent? Under in per delicto case law, I do not believe there does. You say you do not believe. There does not. I'll say it that way. So he says there does. So how do you differentiate the cases he's relying on, the Illinois cases that counsel mentioned? Okay. So, for example, Meadows didn't find there was a specific intent for. Well, the client came with the intent. Right. I mean, the client was right there. That was set forth in the pleadings, but there wasn't an actual finding. McKella, which you referenced several times, the plaintiff, the client, argued to the court, and the court referenced the argument that the plaintiff said, I had no fraudulent intent. And the court said, that doesn't matter. Under the statute that you violated, intent is presumed. So the fact whether or not the client had the requisite intent did not preclude application of an in per delicto bill. Well, when you say the statute, I mean, here we have a consent decree. Right. So we don't have any admissions or findings that he did anything. What we do have, though, is the wrongful conduct relating to the misuse of the funds, and that was intentional. And the court found it. Well, that's the issue. I think when you say it's intentional, I mean. The intent was to use the funds in a manner contrary. Well, where did he get that idea? Where is that in the record? He admits he used the proceeds. He admits he understood the PPMs as written. And the PPMs, there's no reasonable way to interpret those as allowing him to use the money as he did. Well, what about those exceptions that are also in the one year and the three year that were read by Mr. Grasso? He referenced the fact that it said proceeds could be used for the note manager. That's not what happened here. Well, it doesn't matter if it happened. If they said it, it was disclosed. I mean, that's his point. I understand. But what I'm trying to clarify is that's not consistent at all with what Brewer did in view of the representations regarding securing. What about the other one? There are two sentences he read, one from each. I believe the one talked about using proceeds for investments, and the one said one of those investments is the note manager. But what that leaves out is the non-conditional language that the collateral will be held on trust for the holders of the notes. There's no equivocation in there. Judge Mason just read two other quotes that I was going to read, but I won't repeat. But those are unequivocal. And the collateral was never released because the Barclays loan was not paid down. Correct. So these investments, as I asked Mr. Grasso, were unsecured. That is correct. And one point I'd like to clarify is Mr. Grasso said the investors ultimately recover almost all the money and that that's in the record. That is absolutely not in the record. There is nothing in the record that supports that. If the court would go outside the record, they would find out that. Well, we can't go outside the record, so it doesn't matter. I'll skip that. The notes, again, the notes. Well, what case? I mean, he's relying on Metis and Robbins. What do you rely on? I rely on those for the principle that you don't look at the conduct of the attorney, as they keep trying to do here. Both of those cases address that issue specifically. But they're not saying the kind of conduct. They're saying, as I understand it, the conduct of the client, whether the client had the intent. That's the issue. And Mr. Grasso made it very clear that there's nothing here that would be able to show a jury that intent. Well, I disagree with that contention. I believe the representations of the note and his intent to use the proceeds contrary to the note establish wrongful conduct. Didn't Brewer tell Barclays he was going to use the proceeds of the offering to pay down the loan? Correct. That's Exhibit 24 to Brewer's deposition is in the record. He sent a letter to Barclays specifically representing to them that he was going to use proceeds from the note to pay their debt. That was part of the setup to get FPA on board to provide Brewer with the opportunity to promote and sell this note. Mr. Grasso said that the lawyer knew all this and said it was fine. Yes, but what none of their pleadings show or none of the record shows is why anyone thought that would be reasonable, why you could read this PPM and spend over 90 percent of the money on big. There's nothing in the record that supports that that's a reasonable interpretation of what these notes were offering. There's nothing in the record that shows that the attorney knew that he was going to spend 90 percent of it on big. That is correct. All that they put in the record is that the attorney knew he might invest some of the money in big, but there's nothing indicating that he was specifically informed of the extent of the use and that it was ultimately going to be all the funds, that Brewer himself claimed it could be all the funds. Even in his own testimony, he equivocates on what exactly he told Brewer regarding his plan to use almost all the funds. So if both parties are at fault, the lawyers and Brewer, big, then in pareidolic they apply. That is correct. And one other part about the record with respect to Aaron, they quoted this and they said Aaron's understanding was that the portion, meaning the big portion, would be used after the Barclays loan transaction had been resolved. So under their own description of the record, Aaron's understanding was that the Barclays loan would be resolved. But that wasn't done. That was not done at any point in time. And the trial court looked at the actual fact that that wasn't done and that big got 90 percent of the money and said, well, apparently the analysis was it didn't happen by accident. Somebody else didn't do that. Somebody else didn't make that happen. It was Mr. Brewer that made that happen and so said he must have intended to do that. Your opponent is saying we can't infer intent from that fact. That is a correct description of the trial court's analysis and my understanding of Mr. Grasso's position. And we believe the trial court is correct. He acted intentionally using the funds in an improper manner. There's no question, I think, that the representations within the PPM were not compliant. And he's trying to push it off on his attorney that his attorney knew about the use of proceeds. They never actually say the attorney considered this and advised him why it would be okay to use the proceeds in the manner he did. With respect to advice of counsel, plaintiffs argue that, number one, that that defense is not available in the SEC action. The case they cite for that proposition is SEC v. Kokesh, and in that decision itself it sets forth the elements of an advice of counsel defense, showing that it is, in fact, available. The court in this case, in the SEC case, considered advice of counsel and rejected it on the facts because, guess what? They didn't present any evidence that the attorneys know what the use of proceeds was. So we can decide this case without looking at the SEC? Yes, you can. And we contend you can and should. I'm just addressing the fact that they're pointing to advice of counsel as being dispositive in some fashion. We do not agree with that. Furthermore, there's no cases that I've seen that say SIENTA in the context of securities fraud is a requirement under impera delicto. The most analogous case we have, and we've cited, is McLeodry 3 and McLeodry 4, where they specifically addressed a very similar situation. There were misrepresentations with regard to the flow of funds that implied that the funds would be secured by collateral. That did not happen. Trustees sued accountants in that case for failing to stop and detect the loss. The court found, without finding any specific intent, without even addressing the issue of SIENTA, the court found that those misstatements were enough to apply impera delicto in that case. The same is true here. But here the brewer specifically did not admit in the SEC part of this case any wrongdoing. He just signed a consent agreement. Well, we're not relying on the admissions there, but in – You're relying on the ultimate fact of the movement of the money. Correct. The ultimate fact that he did it intentionally and that he was aware of what the FPA – Was there any evidence that somebody snuck it by him? Absolutely not. Was there any evidence that somebody else in the company did this, manipulated it, and he didn't know about it? No. All of the money went from the investors to an FPA USA account that Brewer set up on it and owned and controlled that account. He signed all of the notes. He received all the checks. And then he controlled the disbursement of bruns from that FPA USA account. And there's nothing in the record that he was mentally impaired or on medication or unaware of what was going on around him in the world? Not that I'm aware of. So his signature on these notes would indicate that he knew that these notes were being signed and that he, in fact, signed them. Absolutely. All of those facts are firmly undisputed. They have not raised any of those as issues of dispute. Their focus is entirely on scienter. So when the trial court says, yes, we're holding him accountable for this, we're saying he had the intent to do it, your argument is, yeah, they could say that because he signed these notes and he knew what was going on and there's nothing that disproves that he knows this was going on. Absolutely. And our contention is that is enough under McGladrey, under McKellar. One other issue I'd like to address briefly is the argument relating to whether or not Kegel or Brewer will benefit. Plaintiffs have suggested, since the trustee has stepped in, that there's no benefit to Brewer in this case. And based on my review of the record, there is no way that Brewer would not benefit with a favorable outcome in this case. They claim, the plaintiffs claim in their own pleadings, that the SEC judgment is non-dischargeable. What that means is Brewer is subject to that liability. Regardless of what happens in bankruptcy, he remains personally liable. They purport that they would pay off the SEC judgment. Well, that would resolve a liability he's otherwise subject to. Furthermore, Brewer scheduled and discharged all his other debts. There's nothing in the record that shows any of those creditors or investors have valid claims going forward. Mr. Grasso tells us that the investors have, in fact, been paid off by these insurance policies, so it would stand to reason that the proceeds of any recovery from your client would benefit Brewer. It would, if indeed that was the case, but it's not the case. But regardless, my point is there's no way for those creditors, that's been shown in the record, for them to recover at this point in time. Brewer filed for bankruptcy in 2011. He did not disclose his claim until it was dismissed under grounds of judicial estoppel. Then he sought to get the trustee involved so he could avoid that ruling. And that's why he's still in the case. Lastly, I'd like to just briefly address plaintiff's arguments regarding whether or not the acts need to be separable or not. And I'm not quite sure what their argument is. There's no apparent case law that requires separate and distinct acts or the acts to be combined in any particular way for them to constitute grounds for impaired delicto. In this case, the SEC complaint alleged specifically in paragraph 2 that the offering of the FPA notes to defendants implicitly and explicitly represented to investors that the proceeds would be used to procure collateral, which would be used to secure the notes. Instead, over 90% of the proceeds were dispersed at Brewer's direction to Big and then spent. And the promised collateral was never obtained. All of those allegations are proven on the record put forth before the trial court. And they are all based on undisputed facts. The SEC allegation concludes, as a result representations in the offering materials concerning the use of proceeds and concerning the risk of the investment were materially false and misleading. Those facts are proven. Those facts were central to the SEC judgment. The SEC judgment is based on disgorgement. And it's premised on the amount of proceeds that were actually transferred from FPA USA to Big. So it was the actual use of proceeds that set the amount of damages that they now seek. And the use of proceeds, as I just described, was the allegations in paragraph two of the complaint that had been proven in this case. Those allegations are adequate to show misconduct under impera delicto. They're even sufficient to show obtaining money through false statements or omissions that are misleading, which is a violation of section 1782 of the Securities Act. That is specifically alleged in paragraph 76 of the complaint. And that legal standard does not require any proof of scienter. Finally, I'd like to point out that Brewer's claim damages in this matter request $5.3 million for proceeds of fraud. Those are their own words in an interrogatory answer. No, let's answer the question right there. Well, I presume plaintiffs will dispute that you can enforce their own admissions on that point, but that is what I'm saying. Why would they write that? Well, they're here. I agree that that should be sufficient, because that is exactly what's going on here. Mr. Brewer further claims, still, $4.2 million for civil penalties, despite filing with the federal court a consent decree that said he would not seek reimbursement or indemnification from any other party. I don't understand there are arguments to disregard that statement or that consent decree. And just for the record, that consent decree was entered for the purpose of showing that admission and none other. Big damages are also described as disgorgement of over $5.5 million. Now, disgorgement is a remedy for ill-gotten gains. That's what they seek here, to recover their ill-gotten gains. Brewer and Big profited from proven wrongful conduct. They used more than $5 million in FPA money for themselves rather than to secure collateral for the investors. They now seek to profit again by obtaining that same amount that they already spent wrongfully. Thank you. Unless you have any other questions. I just want to clarify. Your opponent has said that we should send it back because the judge usurped the province of the jury by imputing intent based on facts and arguments that were made in the SEC filings. And you're saying no, don't send it back because these facts were not the province of the jury. They were already found by the SEC, and the judge had a right to rely on them. And besides that, Brewer admitted that this money did not go to secure these loans, and that fact alone proves intent. Is that a correct summary of your positions? It is correct, except we are not relying specifically on the SEC order for any specific findings. The SEC order, I think, is useful to review and persuasive of what the legal standards are and how to analyze what happened in this case. But our central issue and our central reliance is the PPM itself is clear on its face, and Brewer's conduct, intentional conduct, spending the money is contrary to the PPM and is inherently. And the signed notes show that. I'm sorry? The signed notes. And the signed notes. And renders it inherently false and misleading to investors. And no reasonable investor would expect him to use the proceeds in the manner he did, and it would be against public policy to allow him to proceed given those facts. Okay. Thank you. Thank you, Mr. Rupp. Mr. Grasso, briefly. Thank you. The appellee defendant makes most of his argument about the SEC matter, and then when specifically asked if that's what he's relying on, he says no. Because you cannot. Just as the court pointed out, there is no admission in the SEC matter. Let's talk about the derogatory. Brewer specified that his damages consist of $5,355,100 for proceeds of fraud. You know, if that's exactly what's in the SEC. It doesn't matter. This is this case. We're not looking. He said he's not looking at the SEC. You know, we're not looking at the SEC. The judge didn't look at the SEC, so forget the SEC. He's asking for proceeds of fraud. That's what he said in the derogatory. I mean, how can we ignore that? That is not the basis of imperi delicto here. You can make the argument that now he's ‑‑ He owes the money for fraud, he said. He was the one that fraud. The fraud was done by him. There is no admission at all that he committed a fraud. Well, why did he say the proceeds were fraud? I don't have the interrogatory. I'm reading from the interrogatory answer. That's what he said. That's his interrogatory. You cannot contest the admission. If you're going to decide the case on the answer to the interrogatory, I guess ‑‑ Well, that's just one. Okay. That's just one admission. There are others that can be remitted. There are not the other admissions, okay, the other admissions. And what Counselor just said is that they're relying, didn't say the interrogatory answer. He said, we're relying on the PPM, that he knew what was in the PPM, on a generic question. And the only question asked at the deposition was, did you read and understand what's in the PPM? No follow‑up, nothing specific, didn't go to use of proceeds, didn't go to anything else. What did he say? Yes, I did. I read it and I understood it. He said he read it, yes, and he understood it, yes.  The spending of the money is a thread to the argument that he knew he was committing a fraud. What happened here is that the trial judge, she decided that there's enough here for me to determine that he knew, and I'm going to imply that he had the requisite intent, because that's what she said. Intent is part of impari delicto, that I'm going to apply this and find the requisite intent. I'm suggesting to you strongly that under Robbins, under Mettees, under McAuliffe, that is not the proper ‑‑ But there's no Mettees for motions to dismiss, as was McGladrey 2. So we get to McGladrey 4, which is a summary judgment, and it says, notwithstanding the ability to state a claim, once it comes to summary judgment, there's nothing there. It is very similar to the situation. And what they found there was that Greg Bell was one of the Ponzi schemers, and it was already found that a Ponzi scheme had occurred with Mr. Petters. And therefore, the court said, since Mr. Bell was part of the scheme, the investors can't go behind that and go to the accountants. So, but there was ‑‑ but proves my point. They had already determined that a Ponzi scheme had been committed, and that Mr. Bell was part of it. I know we're not ‑‑ the SEC isn't determinative of the facts. Exactly. But disgorgement is based on fraud. You don't get disgorgement unless there's fraud. But that is ‑‑ it came out of a consent decree. You either apply it or you don't. It's in your interrogatory answer. They said, asking for disgorgement, right? As a term, yes. As a term. Well, I mean, yes. It's the same as Brewer said he's asking for proceeds of fraud. It's in the context of the SEC damages, yes. And what is crucial about this case is that he has to be found, if you're going to apply impari delecto, you have to find that he knew he was committing a fraud at the time he was doing it. All right? That is what the case law requires. And the trial judge said, I'm going to, because of what the PPO says and the fact that he spent the money, he must have known. Even though the use of proceeds section in the documents that were drafted by Mr. Aaron gives him the right to do that, and he said so. And at his deposition, Mr. Brewer said, he informed Mr. Aaron that all the proceeds would be used by BIG in its ongoing operations. And then Mr. Aaron testified in his deposition that he understood, in the use of proceeds, that they would be used for operations at BIG. He admitted in his deposition that he never advised Mr. Brewer that they could not be used for that purpose. He also testified that he understood that they could be used for any of the purposes that were in the use of proceeds section, which include investment. He didn't testify that he understood that 90-plus percent of the proceeds could be used for BIG. He didn't testify. He didn't testify one way or the other on that. Okay? That's for the trial. Okay? So that's just not in the record, Your Honor. And then what we do have in the record, because they said there's no written evidence, before the June PPOs were issued, Brewer emailed Aaron on June 12, 2009, and he said to Aaron, the proceeds of the FPA notes will ultimately end up with BIG. Okay? And he said, Barclays, just the opposite. We're going to use the proceeds to pay down your loan. And that is part of the argument. I get that. That's in the beginning, and things change all the time in deals. All right? And then the PPO comes out later, and the PPO is vague. The PPO is talking about Barclays. It's talking about use of proceeds to invest in the manager. It's talking about use of proceeds to invest in FPP. It's all over the place. And even the compliance officer, knowing what was going on, goes to Aaron and says, really, is this enough? Is this adequate disclosure under the SEC? And Aaron says, yes, it is. And Aaron says, and we also, you don't have to register this. And those are the two issues upon which the SEC went after Mr. Brewer. And that's a consent decree with no admissions. And with all due respect, again, while you may think the plaintiff has a weak case, and you may think that the jury will find against the plaintiff, that is not the province of the trial judge, and therefore it's the province of this Court to make that clear and reverse. Where is the record site for recovery of the proceeds of insurance? Do you have that? I'm sorry, I didn't get it. So the investors recovered the proceeds of insurance. I don't know. And I would say that's immaterial, and I'm sorry I brought that up. It's not in the record, right? I will go with counsel, who I've done work with for a long time. It might be a fact that I know, but it's not to be considered. It's not determinative, no more than the SEC consent decree is. All right. Thank you. Thank you. All right, thank you for your arguments today and for your briefs. We will take the case under advisement, and court will stand in recess.